UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| LEXINGTON INSURANCE COMPANY, et al.,<br><br>          Plaintiffs,<br><br>     v.<br><br>CINDY SMITH, et al.,<br><br>          Defendants. | CASE NO. 3:21-cv-05930-DGE<br><br>ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT |

  Plaintiffs' insurance policies were issued for the benefit of tribal owned businesses and properties operating on tribal land.  There is a present dispute as to whether those insurance policies provide coverage for losses alleged to have occurred at the insured businesses and property. Because the issuance of the insurance policies arose out of activities occurring on tribal land—namely, tribal owned business activities on tribal owned lands—a tribe's sovereign right to exclude as well as the consensual relationship between the parties confers tribal adjudicative authority.

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT - 1

Accordingly, and as further explained herein, the Court GRANTS Defendant-Intervenor's Motion for Summary Judgment (Dkt. No. 52), DENIES Plaintiffs' Motion for Summary Judgment (Dkt. No. 54) and DECLINES to take judicial notice (Dkt. No. 58) of certain disputed aspects of the Suquamish Tribal Code.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  The Parties

Defendant-Intervenor, the Suquamish Tribe ("the Tribe"), is a federally recognized Indian tribe located in Suquamish, Washington, and situated on tribal trust lands within the Port Madison Indian Reservation ("the Reservation").[1]  (Dkt. No. 55-5 at 3.)  The Tribe owns and operates several businesses on the Reservation, including the Suquamish Museum and Suquamish Seafood Enterprise ("SSE").  (*Id.*)

Port Madison Enterprises ("PME") is the Tribe's wholly owned economic development arm.  (*Id.*)  PME is a tribally charted branch of the Suquamish Tribe and is headquartered on tribal trust lands within the boundaries of the reservation.  (*Id.*)

---

[1] In reciting the facts of this case, the Court relies, in part, on the findings of the Suquamish Tribal Court and Tribal Court of Appeals.  The existence and extent of a tribal court's civil subject matter jurisdiction over non-tribal members should be evaluated, in the first instance, by the tribal court itself, which serves the orderly administration of justice in the federal court "by allowing a full record to be developed in the Tribal Court before either the merits or any question concerning appropriate relief is addressed." *National Farmers Union Ins. Companies v. Crow Tribe of Indians*, 471 U.S. 845, 856-857 (1985).  Courts apply "a deferential, clearly erroneous standard of review for factual questions" when evaluating decisions by tribal courts that accords with traditional judicial policy of respecting the factfinding ability of the court of first instance.  *FMC v. Shoshone Bannock Tribes*, 905 F.2d 1311, 1313-1314 (9th Cir.1990).

1    The purpose of PME is to develop community resources "while promoting the economic
2 and social welfare of the Tribe through commercial activities." (*Id*.) PME operates numerous
3 businesses, including the Suquamish Clearwater Casino and Resort, Kiana Lodge, White Horse
4 Golf Club, Masi Shop, Longhouse Texaco, and Suquamish Village Chevron. (*Id*.) PME also
5 develops and manages commercial and residential property. (*Id*.) All tribally owned businesses
6 are located on tribal trust lands within the Reservation's boundaries. (*Id*.)
7    Defendants Cindy Smith, Eric Nielsen, Bruce Didesch, and Steve Aycock are judges of
8 the Suquamish Tribal Court and the Suquamish Tribal Court of Appeals. (Dkt. No. 40.)
9    Plaintiffs are insurance companies ("the Insurers") from whom the Tribe and PME
10 purchased, on their own behalf and on behalf of various tribal entities, "All Risk" property
11 insurance coverage. (Dkt. No. 55-5 at 4.) The Tribe and PME purchased their "All Risk"
12 property insurance policies through the Tribal Property Insurance Program ("TPIP"), which is
13 administered by Tribal First, a moniker used by Alliant Specialty Services, Inc. ("Alliant"). (*Id*.)
14    Tribal First promotes itself as a specialized program that "has focused exclusively on
15 meeting the insurance and risk management needs of tribal governments and enterprises since
16 1993." (Dkt. No. 55-1 at 2.) Tribal First bills itself as "the largest provider of insurance
17 solutions to Native America and a leader in the specialty areas of tribal business enterprises,
18 including gaming, alternative energy, construction, and housing authorities." (*Id*.)
19    **B. The Impact of COVID-19 on the Tribe's and PME's Businesses**
20    On March 9, 2020, in response to the outbreak of COVID-19 in Washington State, the
21 Suquamish Tribal Council passed Resolution 2020-048, declaring a public health emergency and
22 activating comprehensive emergency management within the Tribal Government. (Dkt. No. 55-
23 4 at 12.) On March 16, 2020, the Tribal Council passed Resolution 2020-051, restricting access
24

to certain public facilities operated by PME and suspending operations at the Suquamish Clearwater Casino Resort.  (*Id*. at 13.)

On March 27, 2020, the Tribal Council extended the suspension of operations at the Suquamish Clearwater Casino Resort and suspended operations at other tribal businesses, including the Kiana Lodge, the White Horse Golf Club, and the Longhouse Texaco outlets.  (*Id*. at 13-14.)  Tribally run businesses were subject to a phased reopening plan that limited their scope of operations.  (*Id* at 14.)

The Tribe and PME allege that the COVID-19 pandemic damaged the buildings housing tribal businesses, caused tribal businesses to suspend or restrict operations, and further caused tribal businesses to experience loss of use, extended business income loss, and tax revenue interruption even after businesses were allowed to re-open.  (*Id*.)  The Tribe and PME further contend that they have incurred other expenses related to the pandemic, including costs associated with disinfecting and sanitizing their businesses premises.  (*Id*.)

**C.  The Insurance Policies**

The Tribe and PME acquired their insurance policies via insurance broker Brown & Brown of Washington, Inc. ("Brown & Brown").  (Dkt. No. 53-1.)

The relevant insurance policies purchased by the Tribe and PME were in effect from July 1, 2019 through July 1, 2020.  (Dkt. No. 55-5 at 4.)  During this period, the Tribe paid $231,963.00 and PME paid $1,336,007.00 for coverage under their respective policies.  (*Id*.)  The named insureds on the Tribe's policies included the Suquamish Tribal Council, Totten Housing Development Limited Partnership c/o Suquamish Tribe, the Department of Community Development, and SSE.  (*Id*. at 5.)

The named insured on PME's policies included PME and all its operating entities and divisions, including Suquamish Clearwater Casino Resort, Retail Division (including Masi Shop and Suquamish Village Shell), Kiana Lodge, Property Management Division (including Agate Pass Business Park and all other rental properties), White Horse Golf Course, and PME's 401(k) plan. (*Id*.)

### D. The Tribe and PME's COVID-19 Related Insurance Claims

The Tribe and PME contend that the "All Risk" policies issued by the Insurers provide "broad coverage for losses caused by any cause unless the cause is explicitly excluded in the policy." (Dkt. No. 55-4 at 17.) The Tribe and PME argue that the policies issued to them by the Insurers do not exclude losses incurred due to communicable diseases or viruses. (*Id*.) The Tribe and PME submitted claims for coverage under the policies, which Lexington Insurance Company, acting as lead insurer, responded to by issuing reservation of rights letters to the Tribe and PME. (*Id*. at 19; Dkt No. 57.)

### E. Proceedings in Tribal and Federal Court

After the Insurers responded to their claims, the Tribe and PME filed a complaint against the Insurers in the Suquamish Tribal Court. (Dkt. No. 55-4.) The Tribe and PME sued the Insurers for breach of contract, and sought a declaratory judgment that the Insurers were obligated to compensate them for the full amount of their COVID related losses. (*Id*. at 19-22.)

Insurers filed a motion to dismiss the Tribe and PME's complaint, arguing that the Tribal Court did not have personal or subject matter jurisdiction. (Dkt. No. 55-5.) The Tribal Court found that it did have jurisdiction, and the Tribal Court of Appeals affirmed. (*Id*.; Dkt. No. 55-6.)

On December 22, 2021, Insurers, having exhausted their tribal remedies,[2] filed a complaint in this Court seeking a judgment that the Suquamish Tribal Court lacks jurisdiction over Insurers and the claims brought against them in the Tribal Court.[3] (Dkt. No. 1.) By stipulation of the parties, the Tribal Court case is stayed pending the outcome of the action before this Court. (Dkt. No. 48 at 41.)

Plaintiffs' complaint was initially brought against Defendants Cindy Smith, Eric Nielsen, Bruce Didesch, and Steve Aycock in their official capacity as judges of the Suquamish Tribal Court and the Suquamish Tribal Court of Appeals. (Dkt. No. 1.) On March 29, 2022, the Court granted an unopposed motion by the Suquamish Tribe to intervene as a defendant. (Dkt. No. 47.)

### 1. Plaintiffs' Motion for Summary Judgment

On May 2, 2022, Plaintiffs filed a motion for summary judgment. (Dkt. No. 54.) Plaintiffs argue that the Tribal Court is not the proper forum for the Tribe and PME's claims. Plaintiffs contend that tribal courts presumptively lack jurisdiction over non-members, and may only exercise jurisdiction over non-members in exceptional circumstances. (*Id.* at 11.)

Plaintiffs contend that tribal courts may exercise jurisdiction over non-members only when a non-member's conduct took place "on the land," within the territorial boundaries of a

---

[2] Although the existence of tribal court jurisdiction presents a federal question within the scope of 28 U.S.C. § 1331, considerations of comity direct that tribal remedies be exhausted before the question is addressed by the district court. *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 15-16 (1987) (citing *National Farmers Union*, 471 U.S. at 856-857). The federal policy of promoting tribal self-government and self-determination requires that the tribal court have "the first opportunity to evaluate the factual and legal bases for the challenge" to its jurisdiction. *Id.* At a minimum, exhaustion of tribal remedies means that tribal appellate courts must have the opportunity to review the determinations of the lower tribal courts. *Id.* at 17.

[3] In their complaint, Plaintiffs also sought injunctive relief. (Dkt. No. 1 at 35-36.) Plaintiffs filed a motion for a preliminary injunction (Dkt. No. 13), but later withdrew it. (Dkt. No. 50.)

1  tribe, and only when the exercise of such jurisdiction is essential to protect tribal self-

2  government and control internal relations. (*Id*.)

3      Plaintiffs argue that their contractual relationships with the Tribe and tribal entities such

4  as PME, namely the provision of insurance coverage for the Tribe and PME's property, did not

5  occur on tribal land, and are therefore insufficient to establish Tribal Court jurisdiction. (*Id*. at

6  12.)

7          2.   Defendant-Intervenor's Motion for Summary Judgment

8      The Suquamish Tribe filed a motion for summary judgment on May 2, 2022. (Dkt. No.

9  52.) The Tribe asks the Court to adopt the reasoning of the Tribal Court of Appeals, which

10 found that the Tribal Court had subject matter jurisdiction over this claim based on the Tribe's

11 inherent right to exclude non-members from tribal land and the decision of the non-member

12 Insurers to engage in a consensual commercial relationship with the Tribe and PME by issuing

13 them insurance policies. (*Id*.)

14        **II.**       **LEGAL STANDARD**

15     Summary judgment is appropriate if there is no genuine dispute as to any material fact

16 and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The

17 moving party bears the initial burden of demonstrating the absence of a genuine issue of material

18 fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

19     There is no genuine issue of fact for trial where the record, taken as a whole, could not

20 lead a rational trier of fact to find for the non-moving party. *Matsushita Elec. Indus. Co. v.*

21 *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific,

22 significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed. R. Civ. P.

23 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence

24

supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

Here, the parties agree there are no genuine issues of material fact and that the cross-motions raise only legal issues for the Court to consider.

### III.  DISCUSSION

There is no simple test for determining whether tribal court jurisdiction exists. *Stock West, Inc. v. Confederated Tribes of the Colville Reservation*, 873 F.2d 1221, 1228 (9th Cir. 1989). Questions involving tribal jurisdiction remain a complex patchwork of federal, state, and tribal law, which are "better explained by history than by logic." *Smith v. Salish Kootenai College*, 434 F.3d 1127, 1130 (9th Cir. 2006) (internal citations omitted.)

Despite this, there are "two distinct frameworks for determining whether a tribe has jurisdiction over a case involving a non-tribal member defendant:  (1) the right to exclude, which generally applies to nonmember conduct on tribal land; and (2) the exceptions articulated in *Montana v. United States*[.]" *Window Rock Unified Sch. Dist. v. Reeves*, 861 F.3d 894, 898 (9th Cir. 2017).

In *Montana v. United States*, 450 U.S. 544 (1981), the Supreme Court noted that while tribes retain certain inherent sovereign powers, such as the ability to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members, the inherent sovereign powers of a tribe do not, as a general proposition, "extend to the activities of nonmembers of the tribe." 450 U.S. at 565.

"To be sure, Indian tribes do retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands." *Id*.

First, a tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. *Id*. Second, a tribe may also exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe. *Id*. at 566.

The applicability of the Supreme Court's rationale in *Montana* is contingent, to a significant extent, on whether the dispute arose on tribal land. As the Supreme Court noted in *Strate v. A–1 Contractors*, 520 U.S. 438, 445 (1997), "tribes retain considerable control over nonmember conduct on tribal land." 520 U.S. at 454. While the Supreme Court in *Montana* endorsed "the general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe," the Court also stated that "Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations." 450 U.S. at 565.

Thus, "[g]enerally speaking, the *Montana* rule governs only disputes arising on non-Indian fee land, not disputes on tribal land." *Allstate Indem. Co. v. Stump*, 191 F.3d 1071, 1074 (9th Cir.1999). *Montana*, however, did not limit the regulation of non-member conduct on tribal land. To read *Montana* otherwise would "impermissibly broaden *Montana*'s scope beyond what any precedent requires and restrain tribal sovereign authority despite Congress's clearly stated federal interest in promoting tribal self-government." *Water Wheel Camp Recreational Area, Inc. v. LaRance*, 642 F.3d 802, 810-813 (9th Cir. 2011).

Accordingly, distinct from *Montana* exists the second framework for determining tribal jurisdiction rooted in a tribe's right to exclude. As a general principle, "a tribe's right to exclude

non-tribal members from its land imparts regulatory and adjudicative jurisdiction over conduct on that land." *Window Rock*, 861 F.3d at 899.  Citing *Strate*, the Ninth Circuit stated the "Supreme Court tied the scope of [a tribe's] adjudicative jurisdiction to [its] regulatory jurisdiction." *Id*.  "This suggested that, because tribes generally maintain the power to exclude and thus to regulate nonmembers on tribal land, tribes generally also retain adjudicative jurisdiction over nonmember conduct on tribal land." *Id*.  In fact, the Supreme Court has identified that "[c]ivil jurisdiction over . . . activities [of non-Indians on tribal land] presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute." *Id*. at 900 (quoting *Iowa Mut. Ins*., 480 U.S. at 18).  This is because "[t]ribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty." *Iowa Mut. Ins.*, 480 U.S. at 18.

Moreover, the Ninth Circuit has specifically noted that absent concerns of state law enforcement conduct[4] raised in a civil case, "tribal courts have jurisdiction unless a treaty or federal statute provides otherwise—regardless of whether the *Montana* exceptions would be satisfied." *Window Rock*, 861 F.3d at 902.

Therefore, before considering the applicability of the *Montana* exceptions, the Court must determine whether the dispute involves conduct or activities on tribal land such that the Tribe's right to exclude confers tribal adjudicative jurisdiction over the dispute.

---

[4] Civil claims involving state officers enforcing state law was the limited subject of *Nevada v. Hicks*, 533 U.S. 353 (2001).  Therein, the Supreme Court stated, "[o]ur holding in this case is limited to the question of tribal-court jurisdiction over state officers enforcing state law.  We leave open the question of tribal-court jurisdiction over nonmember defendants in general." *Id*. at 358 n.2.  Having repeatedly recognized *Hicks*' limited holding, the Ninth Circuit made "clear that the right-to-exclude framework survives the narrow carve out effected by *Hicks*." *Window Rock.*, 861 F.3d at 903.

### A. The Right to Exclude

The parties dispute whether the contractual relationship arising out of the activity of providing insurance to the Tribe and PME triggers tribal jurisdiction pursuant to the Tribe's right to exclude. Despite acknowledging awareness of providing insurance to the Tribe and PME (Dkt. No. 55-5 at 9)—which means awareness of the business and properties subject of the insurance policies being operated and located on tribal land—the Insurers assert the right to exclude is inapplicable because the Insurers and their employees never physically set foot on tribal land.[5] (Dkt. No. 54 at 30) ("When a nonmember has *not* physically entered and engaged in activity on tribal land, the 'right to exclude' does not apply."). Thus, from the Insurers' perspective "conduct" or "activity" on tribal land requires a party's physical presence on tribal land.

As support, Plaintiffs cite *Employers Mutual Casualty Company v. McPaul*, 804 F. App'x 756 (9th Cir. 2020), which affirmed *Employers Mutual Casualty Company v. Branch*, 381 F. Supp. 3d 1144 (D. Ariz. 2019).[6] Therein, an insurer without any relationship to the tribe in question issued policies to two non-tribal contractors who performed work at a gas station located on tribal land. The tribe sued the contractors and the insurer to recover damages related

---

[5] The Court questions the scope of this relationship and whether the acts of Tribal First are imputed to the Insurers on whose behalf Tribal First sold insurance and presumably helped set insurance premiums. Since 2008, representatives of Tribal First have apparently visited the Suquamish Reservation on several occasions, for purposes including safety inspections and ergonomic assessments; this includes recent visits to the Reservation in July and November 2019. (Dkt. 53-1.) The extent to which the conduct of an intermediary like Tribal First can be attributed to the Insurers, when Tribal first is apparently acting on behalf of the Insurers, is a question not addressed by the pleadings.

[6] Plaintiffs also cite *Water Wheel Camp Rec. Area, Inc. v. LaRance*, 642 F.3d 802 (9th Cir. 2011); *Knighton v. Cedarville Rancheria of Norther Paiute Indians* 922, F.3d 892 (9th 2019); and *Grand Canyon Skywalk Dev. 'SA' Nyu Wa Inc.*, 715 F.3d 1196 (9th Cir. 2013). Although each of these cases involved some type of physical action on tribal land, they do not explicitly state the right to exclude is triggered only through physical presence on tribal land.

to a gas leak that may have been caused by the non-tribal contractors. *Branch*, 381 F. Supp. 3d at 1146–1147. In concluding the right to exclude did not support tribal jurisdiction, the district court stated,

> [the insurer] is not being sued for conduct that occurred while it, or one of its agents, was physically present on the tribal land where the gas station was located. Thus, it's difficult to fathom how the right-to-exclude framework could be construed to confer tribal jurisdiction over a lawsuit against [the insurer]. The theory underlying that framework is that, because a tribe has the sovereign right to exclude non-members from entering its land, the tribe must have the corollary right to adjudicate disputes arising from non-member conduct occurring on its land. Yet here, [the insurer] never set foot on the [tribe's] land. Because the tribe couldn't have 'excluded' EMC from engaging in the conduct at issue (i.e. selling insurance policies to non-member corporations at off-reservation locations), it follows that the 'right to exclude' framework doesn't supply a valid pathway to tribal jurisdiction.

*Id*. at 1149. The Ninth Circuit affirmed the district court's analysis by concluding, "[b]ecause it is not contested that [the insurer's] relevant conduct—negotiating and issuing general liability insurance contracts to [non-tribe] entities—occurred entirely outside of tribal land, tribal court jurisdiction cannot be premised on the [tribe's] right to exclude." *McPaul*, 804 F. App'x at 757.

Here, unlike *Branch* and *McPaul* where the insurer had no dealings with the tribe and was sued only because its insureds performed work on tribal land, the Insurers in this case maintain a direct contractual relationship with the Tribe and PME to insure tribal businesses and property located on tribal land. The Insurers specifically authorized Tribal First to negotiate and issue insurance policies to the Tribe and PME. Moreover, *Branch* acknowledged decisions that "suggested it may be possible to sue an insurance company in tribal court despite the absence of any physical presence on tribal land." 381 F. Supp. 3d at1149 (citing *Allstate,* 191 F.3d at 1075) ("Allstate's conduct in this case . . . is related to the reservation. Allstate sold an automobile insurance policy and mailed monthly premium statements to an Indian resident of the

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT - 12

reservation. After the accident on the reservation, Allstate's agents communicated with the Indians and their counsel."). Accordingly, *Branch* and *McPaul* are inapposite.

The Insurers also argue the absence of insurance regulations in the Suquamish Tribal Code shows "this case has no bearing on tribal sovereignty[.]"[7] (Dkt. No. 54 at 27.) They further assert the Tribe cannot regulate insurance on tribal land because the Tribe "has not been granted regulatory authority by Congress over any aspect of the insurance industry" which means "the Tribal Court cannot exercise adjudicative jurisdiction over Plaintiffs' insurance activity." (*Id*. at 28) (citing *Jackson v. Payday Financial, LLC*, 764 F.3d 765, 782 (7th Cir. 2014)) ("[I]f a tribe does not have the authority to regulate an activity, the tribal court similarly lacks jurisdiction to hear a claim based on that activity"). The Insurers, however, fail to identify any statute or decision that explicitly bars the Tribe from regulating the insuring of tribal businesses and property located on tribal land. The Insurers, therefore, offer no basis to conclude the Tribe lacks the ability to regulate the activity of contractually insuring tribal businesses and property located on tribal land.

In this Court's opinion, providing insurance to businesses and property owned by the Tribe (or its tribal members), operated by the Tribe (or its tribal members), and located on tribal land involves conduct or activity on tribal land that concerns tribal sovereignty and otherwise provides tribal adjudicative jurisdiction based on the right to exclude. First, the selling and issuance of insurance policies originate from activity on tribal land. This is because the coverage provided, and premiums charged, are based on the operation and the management of businesses and property located on tribal land. It matters not that the Insurers physically issued the policies

---

[7] Although this argument is contained in Insurers' discussion of the *Montana* exceptions (Dkt. No. 54 at 27-28), it is addressed here because a "tribe's right to exclude . . . imparts regulatory and adjudicative jurisdiction over conduct on [tribal] land." *Window Rock*, 861 F.3d at 899.

away from tribal land considering that the coverage they sold is based on activities occurring on tribal land.  Second, the tribal business activity occurring on tribal land generates significant economic activity for the Insurers in the form of over $1.5 million in premiums and conversely financially impacts the Tribe and its tribal members.  Third, the losses claimed under the insurance policies are based on business activities occurring at businesses and property owned by the Tribe and PME on tribal land.  Fourth, precluding tribal adjudicative jurisdiction would prevent the Tribe from exercising its right to regulate contractual relations between itself, its members, and non-tribal members as well as regulate business activities on tribal land.[8]  Such preclusion, therefore, impacts tribal sovereignty.

Based on these circumstances, the fact that the Insurers and its employees never physically stepped onto tribal land does not preclude a finding that the issuance of insurance policies subject of this litigation involved conduct or activity on tribal land.[9]  *See Allstate*, 191

---

[8] The Court found instructive the reasoning of the Suquamish Tribal Court of Appeals in considering the applicability of the right to exclude:

> Here the insurance contracts are between the Tribe and the Insurers. Insures (sic) knew they were contracting with the Tribe. The contracts were expressly directed and tied to the Tribe's trust lands and businesses located on the Suquamish Tribe's reservation. The Tribe's claimed losses occurred on Tribal land within its Reservation. The Tribe's breach of contract suit asserts insurer's failed to cover those losses.  The Suquamish Tribe has the authority to regulate insurance contracts with the Tribe covering the Tribe's Reservation lands, and therefore the authority to adjudicate disputes arising under those contacts. Thus, the Tribal Court has subject matter jurisdiction under the right to exclude doctrine.

(Dkt. No. 55-6 at 14.)

[9] Similar to the comment in Footnote 5, the Court questions whether the degree of separation between the Insurers and the Insured created by the utilization of a broker and an insurance program known as Tribal First can divest the Tribal Court of jurisdiction.  The Insurers knew they were contracting directly with the Tribe and PME. (Dkt. No. 55-5 at 13-14.)  Further, as discussed in more detail below, *infra* Section III.B. the insurance policies in question do not exclude the possibility of tribal jurisdiction over claims between the Tribe, PME, and the Insurers.

F.3d at 1075 (rejecting argument that off-reservation settlement activities automatically precluded tribal jurisdiction because, "[t]he authorities . . . suggest that the . . . bad faith claim should probably be considered to have arisen on the reservation.  At the least, [it is impossible] to say that the claim plainly arose off the reservation.").  As such, the right to exclude supports tribal adjudicative jurisdiction in this case.

### B.  First *Montana* Exception

In addition to concluding the right to exclude confers tribal court jurisdiction, the Court also concludes the first *Montana* exception applies.  Under the first *Montana* exception, a tribe may regulate, "through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements."  450 U.S. at 565.[10]  Non-tribal members who choose to affiliate with a tribe or its members in this way "may anticipate tribal jurisdiction when their contracts affect the tribe or its members."  *Smith*, 434 F.3d at 1138.  *Montana's* consensual relationship exception requires that the tax or regulation imposed by a tribe "have a nexus to the consensual relationship itself."  *Atkinson Trading Co., Inc. v. Shirley*, 532 U.S. 645, 656 (2001).  Consent may be established "expressly or by [the nonmember's] actions."  *Water Wheel*, 642 F.3d at 818 (quoting *Plains Commerce Bank*, 554 U.S. at 337).  Courts must consider the circumstances of the relationship between the tribe and the nonmember and whether under those

---

[10] The language of the *Montana* decision suggests that the first *Montana* exception, when applicable, may permit Indian tribes to exercise some forms of civil jurisdiction over non-members on their reservations, "even on non-Indian fee lands."  450 U.S. at 565.  If the first *Montana* exception permits a tribal court to exercise jurisdiction over non-members on non-tribal land located within the Reservation, a tribal court's claim for jurisdiction is presumably stronger when, as here, the relevant dispute concerns tribal properties on tribal land.

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT - 15

circumstances a non-member defendant should have reasonably anticipated that his interactions might "trigger" tribal authority. *Id*.

The Ninth Circuit has previously held that nonmembers may reasonably anticipate being subject to a tribe's jurisdiction when language in an agreement between the tribe and the non-member implies the possibility of tribal jurisdiction over disputes between the parties. *Grand Canyon*, 715 F.3d at 1206 (finding that when a nonmember signed an agreement to act in compliance with all applicable tribal laws, the necessary corollary of this would be that if the non-member operated in violation of the tribe's laws, it could be subjected to its jurisdiction.)

The policies at issues in this case contain a "Service of Suit" clause. That clause provides that "in the event of the failure of the Underwriters hereon to pay any amount claimed to be due hereunder, the Underwriters hereon, at the request of the Named Insured (or Reinsured), will submit to the jurisdiction of a Court of competent jurisdiction within the United States."[11] (Dkt. No. 56-1 at 85.) The Service of Suit clause does not appear to exclude the possibility of Tribal Court jurisdiction, and the Insurers do not appear to have included such an exclusion. (Dkt. No. 53-1 at 3.) Tribal courts have repeatedly been recognized as competent law applying bodies and appropriate forums for the "exclusive adjudication of disputes affecting important personal and property interests of both Indians and non-Indians." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 66 (1978). By insuring tribal businesses located on tribal land, and in doing business with the Suquamish Tribe, an entity with its own legal system and courts of competent jurisdiction, the Insurers should reasonably have anticipated the possibility that any disputes arising under the

---

[11] Plaintiffs argue that the phrase "court of competent jurisdiction" merely permits suit in any court *already* endowed with subject matter jurisdiction over the suit. (Dkt. No. 65.); *Lightfoot v. Cendant Mortg. Corp.*, 580 U.S. 553, 561 (2017). Because the Court finds herein that tribal jurisdiction is supported under the right to exclude, *supra* Section III.A., the Service of Suit clause weighs in favor of finding tribal jurisdiction under the first *Montana* exception.

polices between the Tribe, PME and Insurers would fall within the jurisdiction of the tribal courts.

In *State Farm Insurance Co. v. Turtle Mountain Fleet Farm LLC*, the United States District Court for the District of North Dakota evaluated whether a tribe had jurisdiction under the first *Montana* exception in a case where an insurance company, State Farm, issued a property insurance policy to tribal members for a home on tribal land. No. 1:12-cv-00094, 2014 WL 1883633 at *1 (D.N.D. May 12, 2014). The court found this was a sufficient consensual relationship with respect to an activity or matter occurring on the reservation to invoke the first *Montana* exception, and created a sufficient nexus between the claims of the tribal members and the consensual relationship arising out of the property insurance contract to provide for tribal court jurisdiction. *Id*. at *11.

Here, the Court similarly finds that the underlying insurance policies evidence a consensual relationship between the Tribe and the Insurers. The Insurers were aware they were contracting with, and receiving payments from, the Tribe and PME. The Court further finds that there is a sufficient nexus between the Tribe and PME's claims and the consensual relationship to establish tribal jurisdiction under the first *Montana* exception.[12]

Moreover, finding tribal jurisdiction in this case under the first *Montana* exception would not "swallow" or "severely shrink" *Montana's* "general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Plains Commerce Bank*, 554 U.S. at 330; *see also Montana*, 450 U.S. at 565. This is because there is a contractual relationship between the parties that arises out of activities occurring on tribal

---

[12] As to the Insurers' arguments that the Tribe has no authority to regulate insurance matters or that the first *Montana* exception does not apply because the Insurers had no physical contact on tribal land, those arguments are rejected for the reasons stated previously. *See supra* Section III.A.

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT - 17

property owned by tribal members.  *See supra* Section III.A.  Thus, the facts of this case are in line with the first *Montana* exception and otherwise do not expand the exception.

### C.  Second *Montana* Exception

Under the second *Montana* exception, a tribe may exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.  450 U.S. at 566.  In addition, the non-member conduct in question must do more than injure the tribe, it must "imperil the subsistence" of the tribal community and the exercise of tribal jurisdiction under this exception "must be necessary to avert catastrophic consequences." *Plains Commerce Bank*, 554 U.S. at 341.

The Tribe states that the Court need not reach the second *Montana* exception, but argues, briefly, that the health risks posed by the COVID-19 pandemic and crippling financial losses suffered by the Tribe's revenue generators "directly affects the economic security and health and welfare of the Tribe, satisfying the second *Montana* exception."  (Dkt. No. 52 at 26, n.8.)

At present time, the United States is still recovering from the COVID-19 pandemic, and individuals and businesses are still assessing the human and economic toll.  A tribe might, under these circumstances, plausibly contend that an insurer's refusal to cover significant economic losses stemming from the pandemic imperils the tribe's financial viability.  Considering the nature of the businesses claiming losses, arguably, there is a colorable claim for jurisdiction under the second *Montana* exception.  *See Water Wheel*, 642 F.3d at 817 ("The tribe clearly had authority to regulate the corporation's activities under *Montana*'s first exception and—considering that the business also involved the use of tribal land and that the business venture itself constituted a significant economic interest for the tribe—under the second exception as

well.")  Notwithstanding, on the evidence currently before it, the Court cannot clearly conclude the Tribe's economic loss, while undoubtedly significant, imperils the subsistence of the tribal community.

### D.  Personal Jurisdiction

The Insurers assert the tribal courts lack personal jurisdiction.  As identified in *Allstate*, "this argument is foreclosed entirely by *Farmers Ins. Exchange v. Portage La Prairie Mut. Ins. Co.*, 907 F.2d 911 (9th Cir. 1990), in which [the Ninth Circuit] held that a Montana state court, for purposes of an accident injury claim arising in Montana, had personal jurisdiction over Portage, a Canadian insurer that sold a policy covering travel in Montana." 191 F.3d at 1075.  There, the Ninth Circuit concluded:

> Allstate not only sold a policy covering travel in the Rocky Bay Reservation, it sold the policy to a resident of the reservation.  This sale of a policy is more clearly a 'purposeful availment' of the forum's laws than was Portage's inclusion of Montana within its coverage territory. . . . As in *Portage*, this dispute arose out of the insurance coverage. . . . [I]t is difficult to see why Allstate's amenability to suit in tribal court is any less 'reasonable' than a state's exercise of jurisdiction over a foreign insurance company."

*Id*. (citations omitted).

Although the present matter does not involve an accident injury insurance claim, it does involve insurance sold to tribal members for covered losses occurring at businesses and properties located on tribal land and owned by tribal members.  As in *Allstate*, "it is difficult to see why [the Insurers'] amenability to suit in tribal court is any less 'reasonable' than a state's exercise of jurisdiction over a foreign insurance company."  *Id*.

Moreover, as previously noted, the insurance policies include a Service of Suit clause, which support the Tribal Court's exercise of personal jurisdiction over the Insurers.

## IV. ORDER

Having considered the pleadings filed in support of and in opposition to the motions, the exhibits and declarations attached thereto, and the remainder of the record, the Court finds and ORDERS:

(1) Defendant-Intervenor's motion for summary judgment (Dkt. No. 52) is GRANTED.

(2) Plaintiff's motions for summary judgment (Dkt. No. 54) is DENIED.

(3) The Court DECLINES to take judicial notice (Dkt. No. 58) of certain disputed aspects of the Suquamish Tribal Code.

(4) This case is DISMISSED WITH PREJUDICE and shall proceed under the jurisdiction of the Suquamish Tribal Court.

Dated this 12th day of September, 2022.

David G. Estudillo
United States District Judge

ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT - 20